**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SUSAN ANN UNGER                    CASE NO. 4:18-cv-11200

        *Plaintiff*,                    DISTRICT JUDGE LINDA V. PARKER
*v.*                                               MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant.*
_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (R. 12 & 14)

I.     **RECOMMENDATION**

Plaintiff Susan Unger appeals the Commissioner's final decision denying her disability benefits. For the reasons that follow, I conclude that substantial evidence supports the Commissioner's decision. Therefore, I recommend **DENYING** Plaintiff's Motion, (R. 12), **GRANTING** the Commissioner's Motion, (R. 14), and **AFFIRMING** the Commissioner's decision.

II.    **REPORT**

A.    **Introduction and Procedural History[1]**

Plaintiff applied for Title II Disability Insurance Benefits (DIB) and for Supplemental Security Income (SSI) in March 2015, alleging she became disabled on July

---

[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to me for review. (R. 3.)

31, 2011. (R. 6, PageID.277.)[2] The Commissioner denied the claims. (R. 6, PageID.158-159.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which occurred on June 13, 2017. (R. 6, PageID.56-107.) The ALJ issued a decision on October 25, 2017, finding Plaintiff was not disabled during the relevant period. (R. 6, PageID.36-55.) On March 21, 2018, the Appeals Council denied review. (R. 6, PageID.22-24.)

Plaintiff sought judicial review on April 16, 2018. (R. 1). She then filed the instant Motion for Summary Judgment on June 27, 2018, (R. 12), and the Commissioner countered with its own Motion a month later, (R. 14). Plaintiff has replied, (R. 15), and the case is now ready for resolution.

### B.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically

---

[2] Before this application, Plaintiff had sought benefits twice but never asked for review of the initial-stage denials. (R. 6, PageID.139.)

determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d

640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### C.    ALJ Findings

Following the sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 6, PageID.36-55.) At step one, the ALJ found that the last date Plaintiff was insured was September 30, 2015. (R. 6, PageID.38.) Plaintiff had not worked since her alleged onset date. (*Id.*) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "degenerative disc disease; degenerative joint disease; carpal tunnel syndrome; neuropathy; type II diabetes mellitus diagnosed in 2015; right middle finger septic arthritis treated with a below-the-knuckle amputation in 2017; a headache disorder; and obesity." (*Id.*) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (R. 6, PageID.39.)

Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform

> a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), with the following additional limitations: the opportunity to sit or stand alternatively, provided she is not off task more than 10% of the work period; occasional handling, fingering, feeling, and reaching; no use of the right middle finger; no work around hazards such as unprotected elevations or dangerous moving machinery; and no exposure to vibration. The claimant should be able to wear wrist braces while working and should be able to use a cane for walking.

(R. 6, PageID.39-40.) At step four, the ALJ found that Plaintiff could not perform her past relevant work. (R. 6, PageID.48.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (R. 6, PageID.49.)

### D.    Administrative Record

### 1.    Overview Medical Evidence

This section gives an overview of the record, which the analysis below will expand upon as needed. Plaintiff's chief problems were with her lumbar spine (with pain from her back radiating down to her legs), hands, and wrists. Her back pain began after a 2008 or 2009 forklift accident at work, following which she received epidural injections and was better for about two years. (R. 6, PageID.379.) But on August 31, 2011, her back "gave out," and this time the injections no longer helped and she needed a cane to walk. (R. 6, PageID.379, 410.)

As for treatments, Plaintiff's doctors considered, but ultimately rejected, surgery on her back. (R. 6, PageID.413, 421, 424, 488, 620, 627, 632, 655, 701, 709.) Instead she received injections and pain medications that, she said, offered at best minimal and fleeting relief, *see, e.g.*, (R. 6, PageID.398, 413, 421, 443, 525); usually, they did nothing for the pain. (R. 6, PageID.407, 410, 631, 739). And, according to a report from 2016, at some point she was no longer a candidate for injections, although no explanation was given. (R. 6, PageID.701, 732.)

She also underwent physical therapy, but she consistently stated that it did not help and, if anything, aggravated her symptoms. (R. 6, PageID.404, 407, 413, 418, 421, 676, 739.) The reports from the physical therapist bear out the lack of progress. *See, e.g.*, (R. 6,

PageID.455.) At the end of two months' therapy in May 2012, for example, she continued to have severe restrictions in walking, standing, bending, and rising. (R. 6, PageID.455.) At that time, her range of motion in the lumbar spine had increased but remained between 25 to 75 percent; her leg strength was around four out of five. (R. 6, PageID.457.) In 2013, the leg strength and lumbar range of movement had decreased, even after a full course of therapy. (R. 6, PageID.434, 439.) The records from later sessions are incomplete. (R. 6, PageID.774.)

Physical examinations typically demonstrated limitations in mobility and movement, as well as some strength deficits. The record shows she consistently used a cane, (R. 6, PageID.408, 411, 413, 414, 418, 419 439, 487, 731, 737), and on one occasion used a wheelchair, (R. 6, PageID.390), although a few notes state she could walk without assistance. (R. 6, PageID.405, 479, 745.) Her lumbar spine often was tender (usually mildly) and had a painful or limited range of motion, sometimes severely limited. (R. 6, PageID.372, 380-381, 390, 399, 402, 405, 411, 414, 419, 421, 608, 618, 619, 623, 626, 629, 631, 634, 636, 645, 648, 656, 710, 711, 724, 738, 740, 769, 816.) Her cervical spine also had pain and limited movement, *see, e.g.*, (R. 6, PageID.629, 641), but not routinely, and at multiple examinations she was not tender, her neck was supple, or her cervical spine had normal range of motion. (R. 6, PageID.380, 605, 608, 610, 632, 636, 688, 779.) Her arms and legs often were not tender and displayed normal range of motion, except when she raised her shoulders or legs. (R. 6, PageID.372, 380, 421, 480-481, 611, 619; *but see* R. 6, PageID.621, 623, 632, 634 (noting lower quadrant tenderness), 731.) Her strength and reflexes were varied, sometimes normal or nearly so, (R. 6, PageID.390, 421, 614, 631

(grip), 632 (grip), 638, 641, 645, 648, 656, 688, 711, 738, 816 (all except grip), 819), and other times reduced, (R. 6, PageID.408, 411, 616, 629, 632 (legs), 634, 691 (mild weakness), 724 (mild weakness), 740, 745, 747, 816 (grip)). She could not always perform straight-leg raises, and pain usually occurred when she did, (R. 6, PageID.381, 421, 632, 636, 638, 656, 710, 711, 724, 740, 769), but not always, (R. 6, PageID.648, 738, 816.)

The findings from one physician, Dr. Diad Dali-Ahmad, who treated Plaintiff's finger, differed from those just discussed. He consistently noted that Plaintiff's neck, spine, and extremities had full range of motion without any pain or tenderness, and that Plaintiff did not complain of any muscle pain. (R. 6, PageID. 734, 43, 751, 755, 758, 761-762, 776., 776-777.)

Imaging studies usually showed degeneration and other problems with her spine. Various cervical-disc levels had mild bulges or protrusions; at the C3-C4 level the disc likely contacted a nerve and displayed "moderate-severe left neural foraminal stenosis" and "mild right neural foraminal stenosis." (R. 6, PageID.603; *see also* R. 6, PageID.539 (noting "slight denervation of the cervical paraspinal muscles, probably related to degenerative cervical spine disease").) One study found "no evidence of cervical radiculopathy, brachial plexopathy, diffuse neuropathy or other mononeuropathy of both extremities." (R. 6, PageID.674.) Her lumbar spine had mild to moderate degenerative changes, small bone spurs, disc bulging, and mild stenosis (that is, narrowing)[3] from disc protrusions affecting the nerve root. (R. 6, PageID.506, 514-515, 549, 551, 552-553, 556-

---

[3] Mayo Clinic, *Spinal Stenosis*, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last accessed April 8, 2019).

558, 559, 560, 664, 788.) In 2014, one physician characterized these results as showing "significant abnormalities . . . including effacement of the nerve roots that account for her history of pain and debility." (R. 6, PageID.616.) Some of the studies indicated that Plaintiff had limited flexion (that is, bending)[4] movement. *See, e.g.*, (R. 6, PageID.551, 559.) A more recent lumbar spine, from 2016, displayed "mild progression of degenerative spondylosis," "mild neuroforaminal stenosis," and "mild central canal stenosis." (R. 6, PageID.787.)

Studies from her treating physician, Dr. Nael M. Tarakji, are reviewed in more detail in the analysis below; here, it suffices to say that they did not reveal any extreme or severe issues. At Plaintiff's initial appointment Dr. Tarakji reviewed MRI results, concluding that her pain was accompanied by "no evidence of radiculopathy and could be secondary to mild disk pathology causing degenerative changes or bulging disk." (R. 6, PageID.538.)

Regarding her hands and wrists, she had carpal tunnel syndrome that her treating physician, Dr. Tarakji, called "mild" in 2013. (R. 6, PageID.538.) He gave her trigger point injections and prescribed a wrist brace. (*Id.*) She reported numbness "not associated with weakness." (R. 6, PageID.539; *see also* R. 6, PageID.530.) Most of his reports are brief, simply restating her issues, noting that he provided injections, and mentioning her wrist brace or medications. *See, e.g.*, (R. 6, PageID.523, 525-531, 672-673, 675-677, 680-681.) Sometimes he also mentioned that she had back pain and noted imaging results. (R. 6, PageID.524-525, 674.) He characterized his treatment as conservative, and ruled out

---

[4] 2, J.E. Schmidt, Attorney's Dictionary of Medicine and Word Finder, F-113 (2013).

surgery. (R. 6, PageID.527, 530, 531, 673, 676, 677, 680.) By the end of their recorded treatments, he had stopped the injections. (R. 6, PageID.682.)

Her other hand issue involved the deterioration of her right middle finger. At some point, a nerve in the finger was lacerated and required surgery. (R. 6, PageID.655.) In December 2015, the finger became infected. (R. 6, PageID.779-780.) The following March, a bone scan revealed septic arthritis. (R. 6, PageID.791.) Antibiotics helped but the finger remained swollen and had "some laxity," (R. 6, PageID.701, 703), and eventually had to be amputated below the knuckle, (R. 6, PageID.68-69).

Examinations of her wrists and hands were mixed. Many revealed normal strength and range of motion, and she often was able to grip items and use her hands for various tasks, such as opening jars. *See, e.g.*, (R. 6, PageID.380, 390, 479-480, 631-632; *but see* R. 6, PageID.816.) At one examination, she had "mild difficulty picking up a coin, buttoning[,] and opening a door." (R. 6, PageID.816.)

## 2. Application Report

Plaintiff completed an Adult Function Form on May 7, 2015. (R. 6, PageID.310-318.) Her conditions limited her ability to work because she could not "walk distances," "carry more than a gallon of milk," or sit or stand for over 20 minutes. (R. 6, PageID.310.) Writing proved difficult because her hands would "grow sore and tired." (R. 6, PageID.310, 317.) She also needed help bending and reaching, and often someone had to accompany her while shopping. (*Id.*)

On a typical day, she got her "children up and off to school," then picked a household chore she could complete, interspersed by periods of standing and sitting. (R. 6,

PageID.311.) Once that was done, she rested until she felt well enough to tackle another small task. (*Id.*) Dishes and vacuuming took only a few minutes, but other tasks "could take hours," and she needed help at times. (R. 6, PageID.312.) Yardwork was beyond her capabilities. (R. 6, PageID.313.) She would cook, do laundry, let the dog out, and help with homework; but she had help, as her children took care of the pets. (R. 6, PageID.311.) Cooking occurred a few times a week and took longer than it used to because she sometimes needed breaks to sit down. (R. 6, PageID.312, 317.) While she could drive and ride in a car, she never left the house alone because activities were "hard to complete on my own[,] especially shopping." (R. 6, PageID.313.) In a store, for example, she needed an electric wheelchair, which could cause a shopping trip to drag on for hours. (*Id.*)

For fun, she read, sewed, and played computer games, but her conditions limited these activities. (R. 6, PageID.314.) People would visit her at home three to four times a week and take her shopping two to three times each week. (*Id.*) "[B]ecause I am not working I have limited peer interaction," she added. (R. 6, PageID.315.)

Usually, she slept for about four hours a night, often waking due to pain. (R. 6, PageID.311.) Her conditions also restricted many personal care activities, such as dressing, bathing, and shaving. (*Id.*) But she did not require any reminders about personal needs or medication; nor did she struggle with financial matters. (R. 6, PageID.312-314.)

Her conditions affected a host of abilities: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, concentrating, and using her hands. (R. 6, PageID.315.) She got along with family, friends, and authority figures. (R. 6, PageID.315-316.) She could pay attention "until pain becomes unbearable,"

and she followed instructions well, though she needed help "with certain parts." (R. 6, PageID.315.) When walking, she used a cane, and when shopping, a wheelchair. (R. 6, PageID.316.) Her long list of medications came with multiple side effects, including chills, dizziness, loss of balance, sweating, thirst, muscle spasms, sleep disruption, gas, and weakness. (R. 6, PageID.317-318.)

### 3. Administrative Hearing

#### a. Plaintiff's Testimony

The hearing was held in June 2017. (R. 6, PageID.58.) At that time, Plaintiff lived with her fiancé, her grandson, and her son and his fiancée. (R. 6, PageID.62.) Her back "went out" on July 31, 2011, her last day of work. (R. 6, PageID.64.) After she stopped working, she completed both her associates and bachelor's degrees by taking online classes. (R. 6, PageID.62-63, 74, 76-77.) The schooling was full time, which amounted only to six hours per week. (R. 6, PageID.76-78.) Until about December 2011, she had received unemployment benefits and searched for work. (R. 6, PageID.65.)

Back pain, and the limitations it imposed on her walking, standing, bending, and lifting, prevented her from working. (R. 6, PageID.65-66.) The condition had grown worse since 2011. (R. 6, PageID.66.) She had used a cane since 2012, when a physical therapist recommended one. (R. 6, PageID.66-67.) From 2011 to 2015, she had used a wheelchair whenever she left the house. (R. 6, PageID.78.) In addition to back pain, her legs bothered her, often tingling, going numb, or rippling with muscle spasms. (*Id.*) Her left knee was weak, requiring treatment. (R. 6, PageID.80.) A herniated disc in her neck caused pain and prevented her from turning her head, but it was not as limiting as her back pain. (R. 6,

11

PageID.82.) Balancing, too, was difficult, and she had fallen a few times. (R. 6, PageID.79.) High blood pressure made her tired and the pills she took for it led to frequent bathroom breaks. (R. 6, PageID.83.) About twice a month, she was wracked by headaches that lasted hours and disrupted her concentration. (R. 6, PageID.84.)

Regarding her physical capabilities, she testified that she needed to change positions every 10 to 15 minutes. (R. 6, PageID.67.) Five pounds was the most she could lift, carry, or pull, and it was more than she could push. (*Id.*) Reaching caused spasms to shoot through her back, while bending or crouching would hurt her back and affect her vision. (R. 6, PageID.69.) If she could lean on something, dressing was not a problem. (R. 6, PageID.70.) She sometimes drove, only to the store, and had taken just one trip longer than 75 miles since she stopped working. (R. 6, PageID.71.) After 45 minutes riding in a car, she needed about a 15- or 20-minute break. (*Id.*)

Grasping objects with her hands was troublesome. (R. 6, PageID.67.) She could not, for example, pick up a gallon of milk without using both hands. (*Id.*) To help, her doctor had prescribed wrist braces in 2012—she wore them constantly. (R. 6, PageID.68.) A few months before the hearing, her right middle finger—on her dominant hand—became infected and was amputated below the knuckle. (R. 6, PageID.68-69.) She also had carpal tunnel syndrome, which caused pain and numbness in her wrists and elbows; she had put surgery on hold, however. (R. 6, PageID.83.)

Everyone in the household pitched in with chores. (R. 6, PageID.69-70.) On good days, she could vacuum or do the dishes; on the three or four bad days a month, she stayed

in bed. (R. 6, PageID.87.) Occasionally she visited friends or relatives, but mostly they came to her. (*Id.*)

As in her Function Report, she said she liked to read and sew. (R. 6, PageID.70.) In addition, she "like[d] to do my little bit of gardening," which consisted of planting and covering "stuff" that others had prepared for her. (*Id.*) All told, she had about 15 to 20 plants. (R. 6, PageID.86.) At her previous house, where she lived until about a year prior, her garden had contained 50 to 60 plants "and the only thing I would have to do is weed that. And that took a long time." (R. 6, PageID.86.)

She continued to take a host of prescriptions for pain and anxiety, and she also received cortisone shots. (R. 6, PageID.72.) The treatment was helpful "to certain extents," she concluded, (R. 6, PageID.72-73), although later she stated that she stated that injections had not helped. (R. 6, PageID.80.) On one occasion she went to the emergency room and was given a shot for back pain. (R. 6, PageID.73.) A doctor at the University of Michigan counseled against surgery, warning that it would not relieve the pain but could actually make matters worse. (R. 6, PageID.74.) Her physical therapy sessions had ended, although she continued to do the exercises at home. (*Id.*) Aside from these treatments, she used heat and ice and, for three to four hours a day, would "lay down, put my feet up, have quiet time, just relaxing." (R. 6, PageID.81.) Since stopping work, she had not seen any mental health providers. (R. 6, PageID.74.)

Even if a job allowed her to sit or stand, she could not work full-time because she needed to elevate her feet. (R. 6, PageID.86-87.) A day at, say, a movie-ticket counter or reception desk would need to be followed by a day of rest. (*Id.*)

###### b.  Vocational Expert's Testimony

The ALJ asked the vocational expert to imagine an individual with Plaintiff's general background

> who cannot perform more than light work [as defined in the regulations] . . . . The person should be able to alternate from sitting to standing and from standing to sitting for up to 5 minutes approximately every 20 minutes. Assume a limitation to no more than frequently handling, fingering, feeling, and reaching. The person should not work around hazards, such as unprotected elevations or dangerous moving machinery and should not be exposed to vibrations.

(R. 6, PageID.95.) That individual could not perform Plaintiff's past jobs, but could work as an unskilled office clerk (150,000 positions nationally), packer (100,000 positions), or bench assembler (40,000 positions). (R. 6, PageID.95-96.) If that same individual could sit or stand at her pleasure, as long as she remained on task at least 90 percent of the time, she could perform the same jobs but fewer positions in each would be available. (R. 6, PageID.96.)

The ALJ then asked, "Could a person that does these jobs wear wrist braces and do the work?" (*Id.*) "I think to wear wrist braces," the expert replied, "I'm going to reduce these numbers" of available positions "because I don't think all of those jobs are going to accommodate wrist braces." (*Id.*) Consequently, only 35,000 clerk positions would remain, 45,000 packer positions, and 10,000 bench assembler positions. (*Id.*) Adding a cane-use requirement on top of the other limitations would further erode the numbers to 20,000 clerk positions, 25,000 packer, and 5000 assembler. (R. 6, PageID.97.)

At a sedentary job level, with the additional limitations above, 50,000 unskilled office clerk positions would be available, 45,000 reception and information clerk positions,

and 15,000 surveillance system monitor positions. (*Id.*) If the individual could not use the middle finger of her dominant hand, 20,000 office clerk positions would remain available, 30,000 reception and information clerk positions, and 10,000 monitor positions. (R. 6, PageID.99.) But no jobs were available if the individual needed to elevate her legs at waist level or above, had more than one unexcused absence a month, or was off task more than 15 percent. (*Id.*)

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[5] group the sources of evidence into two categories, "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513, 416.913 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a) (2016). "Other

---

[5] Various amendments have been made to the regulations since Plaintiff filed her claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed her claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527, 416.927. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. §§ 404.1527(c), 416.927(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those

16

factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1

(6th Cir. 1995).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996).[6] Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also

---

[6] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. §§ 404.1529(c), 416.929(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

relevant. 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

### G.      Arguments and Analysis

Plaintiff offers three arguments, which are better bunched into two. The first contends that the ALJ failed to consider her ability to sustain work, as he was required to by SSR 96-8p. In the course of this argument, Plaintiff appears to suggest that the RFC should have been more restrictive, and this implicates her other contention that the ALJ botched his treating-source analysis of Dr. Tarakji. The second argument is that the occupational base was eroded, per SSR 96-9p, and the expert should not have opined on whether employers would accommodate her conditions. I will address these arguments in turn.[7]

### 1.      Residual Functional Capacity and Treating Source Opinion

Plaintiff believes that the RFC should have better reflected her inability to "sustain work activity" and "maintain a regular work schedule." (R. 12, PageID.873.) The ALJ was bound by SSR 96-8p to consider these matters but failed to do so, according to Plaintiff. (*Id.*) She then lists evidence from treatment records and her own statements that she had fatigue, trouble sleeping, headaches, anxiety, back pain, and irritability. (R. 12, PageID.873-875.) Her treating neurologist, Dr. Tarakji, thought that her symptoms

---

[7] In the fact section of Plaintiff's brief, she takes a few swings at the ALJ's step-three analysis, calling it cursory, suggesting the ALJ should have consulted an expert, and describing a couple paragraphs' worth of evidence on the topic. (R. 12, PageID.870-871.) None of this appears in the argument section, nor does Plaintiff ever outright conclude the ALJ erred at step three. Her grumbles, then, do not amount to an argument the Court must address. *See generally Gothard v. Comm'r of Soc. Sec.*, No. 1:17-cv-13638, 2018 WL 7254254, at *15 (E.D. Mich. Oct. 10, 2018) (hidden and skeletal arguments are not preserved), *Rep. & Rec. adopted by* 2019 WL 396785 (E.D. Mich., Jan. 31, 2019).

markedly interfered with her concentration and stamina, concluding that she would often be off task and miss at least three days a month. (R. 12, PageID.875.) The argument then takes a slight turn in the final paragraph, appearing to suggest that the RFC's limitation to unskilled work did not account for her various symptoms.[8]

In a related argument, Plaintiff contends that the ALJ failed to give Dr. Tarakji's treating opinion controlling weight. (R. 12, PageID.882.) Specifically, the ALJ ignored the conclusion that Plaintiff could not sustain a regular work schedule. (*Id.*) According to Plaintiff, the lack of diagnostic test results on this point—which the ALJ cited in discounting the opinion—is irrelevant: "There is not a diagnostic test which will measure how long a person can sustain a work week." (*Id.*) She adds that the ALJ also erred in claiming that the objective evidence showed only mild to moderate problems. (*Id.*) As proof, she recounts evidence, mostly from imaging studies, describing impairments such as the disc bulges and protrusions. (R. 12, PageID.884.) Likewise, the conservative nature of her treatment—another factor the ALJ relied on—fails to justify the result in this case, Plaintiff argues. The doctors did not believe she could forego surgery, indeed, they "would like to operate on her back to give her some relief, they just don't have a strategy which they believe would work given the multi-level nature of her pathology." (*Id.*) To bolster this contention, she offers a single record from Dr. Rebeca Baumbach stating that Plaintiff should obtain a surgeon's opinion about whether surgery was necessary. (*Id.*, citing R. 6,

---

[8] She never articulates this conclusion, but it's a safe bet she meant to: the paragraph starts with a few sentences and citations about how unskilled work fails to reflect mental impairments. (R. 12, PageID.876-877.)

PageID.616.)

To the extent Plaintiff means to claim that SSR 96-8p mandates an explicit discussion in the ALJ's decision, she is mistaken. True, the Ruling does state that the ALJ "must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)." SSR 96–8p, 1996 WL 374184, at *7. But most courts do not require a separate and explicit discussion of this topic. *Houston v. Comm'r of Soc. Sec.*, No. 14–14426, 2015 WL 5752720, at *18 (E.D. Mich. Aug. 25, 2015), *Rep. & Rec. adopted by* 2015 WL 5729079 (E.D. Mich. Sept. 30, 2015); *Trischler v. Comm'r of Soc. Sec.*, No. 14–12867, 2015 WL 5016600, at *20 (E.D. Mich. Aug. 24, 2015).

The reason for letting ALJs forego an express discussion is that the RFC already considers the claimant's "maximum remaining ability to do sustained work activities in an ordinary setting on a regular and continuing basis," which is a forty-hour work week. SSR 96–8p, 1996 WL 374184, at *2; *see also* 20 C.F.R. § 404.1545(b), (c) (requiring an assessment of physical and mental abilities to "determine your residual functional capacity for work activity on a regular and continuing basis"). As such, the RFC reflects a decision on "whether the claimant can sustain a regular work schedule." *Houston*, 2015 WL 5752720, at *18 & n. 7 (collecting cases). "Generally," one court explained, "such a finding is implicit. There is no requirement to make an explicit 'regular and continuing basis' finding absent evidence of a waxing and waning nature of the claimant's symptoms, such that the impairments interfere with the claimant's ability to maintain employment on a continuing basis." *Thomas v. Comm'r of Soc. Sec.*, No. 1:03–CV–925, 2005 WL 588752,

at *6 (E.D. Tex. Jan. 3, 2005); *see also Thomas v. Comm'r of Soc. Sec.*, No. 15-13291, 2017 WL 927623, at *8 (E.D. Mich. Feb. 17, 2017) ("There is no indication that [SSR 96-8p] was intended to impose a formalistic requirement that an ALJ expressly state that the RFC reflects a claimant's ability to perform the specified level of activity on a regular and continuing basis."), *Rep. & Rec. adopted by* 2017 WL 914027 (E.D. Mich. Mar. 8, 2017); *Soucie v. Comm'r of Soc. Sec.*, No. 2:16-cv-10576, 2016 WL 11259073, at *9-10 (E.D. Mich. Oct. 24, 2016) (noting that the ALJ does not need to explicitly discuss the topic), *Rep. & Rec. adopted by* 2017 WL 727279 (E.D. Mich. Feb. 24, 2017).

As such, the ALJ did not need to draft a separate section on Plaintiff's ability to sustain work. Even so, the ALJ's decision touches upon the subject, making it clear that he considered the matter. For one thing, he cited SSR 96-8p and the definition of the RFC as the most Plaintiff could do "on a sustained basis," (R. 6, PageID.38), a phrase which "suggests that the ALJ considered Plaintiff's capacity to work for an extended period." *Trischler*, 2015 WL 5016600, at *21; *see also Soucie*, 2016 WL 11259073, at *10 (finding that, although the ALJ failed to explicitly discuss working on a "regular and recurring basis," the decision was adequate because, in part, it mentioned the definition of RFC and cited SSR 96-8p). He then said that Plaintiff's RFC represented her specific abilities to work "on a sustained basis," again citing SSR 98-6p. (R. 6, PageID.41.) The decision also addressed opinion evidence that discussed Plaintiff's abilities to function during a normal workday, demonstrating that the ALJ's analysis considered her capacities in the context of a competitive work schedule. (R. 6, PageID.47.) *Cf. Soucie*, 2016 WL 11259073, at *10 (noting that limiting Plaintiff to standing and sitting for a number of hours in an "eight-

22

hour workday" displays the ALJ's cognizance of SSR 96-8p.

More importantly, the ALJ cited and engaged almost all the evidence that Plaintiff now puts forward as proof she cannot sustain work—and to the extent Plaintiff means to say that the RFC should have been more restrictive, her argument does not carry the day. Regarding her headaches, she cites only her own testimony that she gets two headaches a month that last for hours and disrupt her concentration. (R. 12, PageID.875; R. 6, PageID.84.) The ALJ provided a deeper discussion, beginning with Plaintiff's June 2012 visit to the emergency room due to a headache. (R. 6, PageID.45, citing R. 6, PageID.565.)[9] He then noted subsequent MRIs that seemed to uncover abnormalities. (*Id.*, citing R. 6, PageID.500-501.) But these issues, the ALJ stated, resolved a few months later, as evidenced by another MRI, and remained resolved through 2017 when an electrocardiogram failed to reveal any abnormalities. (*Id.*, citing R. 6, PageID.507, 831.) Aside from these reports, the record contains little else on the matter, and no other objective evidence or even subjective complaints that speak to the frequency and functional effects of the headaches. *See, e.g.*, (R. 6, PageID.389 (noting only that she had headaches), 531 (same), 538 (same).) Thus, the ALJ's discussion was adequate for purposes of SSR 96-8p and the record does not support any further limitations to account for her headaches.

The same goes for Plaintiff's complaints of fatigue and insomnia. The record

---

[9] In fact, it appears that the headache that sent her to the hospital was related to an epidural she had received the day before, when she had a CT myelogram. (R. 6, PageID.565.) It was after that procedure that the headache began. (*Id.*) A myelogram involves injecting dye into the spinal column. Johns Hopkins, *Myelogram*, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/myelogram (last visited April 9, 2019). The emergency room doctors gave her a blood patch, which the discharge records explain is a treatment for a spinal headache that result after spinal taps. (R. 6, PageID.564, 568, 571.)

contains evidence that she had these conditions, although there is not much, and almost all of it comes from her subjective complaints. *See, e.g.*, (R. 6, PageID.71, 311, 628, 767.) Critically, none of it suggests any limitations that might result from the fatigue and that the ALJ should have incorporated into the RFC. Without something to translate the bare complaint of fatigue into concrete limitations, it is difficult to conclude the ALJ erred. Though his decision does not specifically address fatigue—which appears never to have been formally diagnosed—he noted that Dr. Kavitha Reddy, whom Plaintiff saw frequently in 2012 and 2013, advised against bedrest and instead encouraged exercise and walking. (R. 6, PageID.48, citing R. 6, PageID.389-391.) Indeed, the record contains many reports that she exercised and walked, or was encouraged to. (R. 6, PageID.605, 684, 699, 705-706, 711, 719, 728, 740.) What prevented her, on occasion, from exercising was not fatigue but pain. (R. 6, PageID.628, 703; *see also* R. 6, PageID.640 (mentioning that she could not exercise but failing to explain why).) Of course, a person suffering from fatigue might be able to do brief exercises but still be unable to sustain full-time employment—but Plaintiff has not provided any evidence to that effect or any other reason to reject the ALJ's analysis.

As for anxiety and irritability, the record contains even less evidence than it does for fatigue. She cites only two reports to establish these issues. (R. 12, PageID.875.) The first simply says, "She has anger issues due to limitations from her back pain." (R. 6, PageID.707.) The statement appears in the introductory section of the report (not the "objective" section), apparently where Plaintiff's statements were recorded. (*Id.*) Regardless, the medical provider did not diagnose any mental or emotional disorders. The second report did assess "[a]djustment disorder with anxiety," because she asked for a

24

referral for counseling due to a family trauma. (R. 6, PageID.684.) She had "some anxiety regarding the situation," she explained. (*Id.*) At the previous session with that medical provider, she had denied anxiety, (R. 6, PageID.690), as she did most other times when anxiety was mentioned, (R. 6, PageID.720, 731, 734, 737, 743, 751, 755, 758, 761, 776). Only a few times did she complain of anxiety, but the records provide few details why and no suggestions that the condition limited her to any appreciable degree, (R. 6, PageID.739.) Nor do any counseling reports appear in the record.[10]

Likewise, the record offers precious little on Plaintiff's irritability. One report simply indicates she had anger, without elaboration. (R. 6, PageID.768.) In the Function Report, she mentioned "get[ting] mad because I can't do things." (R. 6, PageID.316.) Even if there was more evidence, it is unclear why Plaintiff believes that irritability would prevent her from sustaining work. Perhaps it would lead to conflicts with coworkers, thus preventing her from sustaining employment; but she never makes this claim, and in fac, said she got along well with others, had never been fired, and handled stress well. (R. 6, PageID.316.) Given the paucity of evidence on these conditions, Plaintiff has failed to show that the ALJ (who did not directly address anxiety or irritability) should have crafted a more restrictive RFC to account for their effect on her ability to sustain work.

The ALJ also explained that he accommodated her pain with the RFC's sit-or-stand option and allowance of cane usage. (R. 6, PageID.48.) The body of the ALJ's decision

---

[10] At the end of one report, Dr. Dani Niketa stated that she told Plaintiff to consider seeing a therapist for "frustration and depression." (R. 6, PageID.709.) But the report nowhere mentions these conditions or states that she suffers from them, and the results from that day's psychiatric examination were normal. (R. 6, PageID.709-710.)

deals with Plaintiff's limitations related to pain, so he has fulfilled any procedural duty under SSR 96-8p to consider her ability to maintain continuous employment despite the pain. Unlike the other impairments Plaintiff discusses, however, she did present objective evidence of limitations resulting from the pain and impairments and bearing on her sustaining employment: Dr. Tarakji's opinion. The remaining issue, then, is whether the ALJ owed greater deference to that opinion's conclusions on Plaintiff's ability to work full-time.

Dr. Tarakji's opinion came in a two-page preprinted form he filled out in July 2017. (R. 6, PageID.828-829.) His diagnoses were carpal tunnel syndrome, neck and back pain, and vascular headaches. (R. 6, PageID.828.) Asked for supporting signs, symptoms, and tests, he merely wrote "pain/numbness of both hand[s]" for the carpal tunnel, "neck + back pain" for that ailment, and "H.D." presumably for the headaches. (*Id.*) According to Dr. Tarakji, Plaintiff could sit for four hours in an eight-hour workday, and stand and walk for two hours each. (*Id.*) She could sit, stand, or walk for two hours each without interruption, and though she needed the option to sit or stand as she chose, she would not "need to lie down or recline at . . . her discretion" or elevate her leg. (*Id.*) Bending, squatting, kneeling, and stooping each had to be limited to 5 to 10 times a day, but repetitive foot controls could be used with no specified limitations. (*Id.*) Reaching, handling, gripping, and turning could be done occasionally (meaning up to one-third of the workday), as could lifting up to five pounds (she could not lift any weight frequently, meaning between one- and two-thirds of the workday); pushing, pulling, fingering, and fine coordination needed to be extremely limited. (R. 6, PageID.828-829.) Her fatigue, pain, and symptoms would not markedly

26

interfere with her ability to understand, concentrate, work persistently, and maintain pace; however, these problems would markedly interfere with her completing work on a sustained and continuous basis or performing at a consistent pace without unreasonable numbers of breaks, and they would force her to take extra breaks and miss three or more days of work a week. (R. 6, PageID.829.)

The ALJ reviewed Dr. Tarakji's records and his opinion, which he accorded limited weight. (R. 6, PageID.43-47.) Recognizing that Dr. Tarakji was a treating source familiar with Plaintiff's longitudinal history, the ALJ nevertheless discounted it because "the test results and the clinical findings documented in Dr. Tarakji's treatment records indicate mild to moderate, not 'extreme,' limitations. In addition, the claimant's treatment has remained conservative in nature." (R. 6, PageID.46-47.)

To devalue the opinion and surmount Plaintiff's challenge, the ALJ had to come up with "good reasons" to question the opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). I believe he did. One "good reason" to discount an opinion is that it lacks support, "particularly medical signs and laboratory findings," and offers only a flimsy explanation of its conclusions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3); *Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 340 (6th Cir. 2008) ("When citing 'good reasons,' the ALJ should consider certain factors outlined in 20 C.F.R. § 404.1527[(c)], 'namely . . . supportability of the opinion.'" (citation omitted)).

The ALJ touched upon this rationale by observing that Dr. Tarakji's records did not support his opinion. Plaintiff's initial response to this conclusion is that diagnostic tests cannot measure ability to sustain work. (R. 12, PageID.882.) Whether true or not, the ALJ's

27

basic observation is correct: Dr. Tarakji's reports say little about fatigue, sleep troubles, or even the severity of her pain. (R. 6, PageID.523-539, 672-682.) His medical notes are, for the most part, slim statements that Plaintiff had pain, received injections, and should continue the current treatment course. *See, e.g.*, (R. 6, PageID.525-530.) Examination results were usually not recorded, and those that were do not help Plaintiff's case. The June 2013 exam produced largely normal results: she had "normal tone, bulk and muscle strength of all muscle groups at 5/5," her tactile sensations were normal, and even her gait was normal, "including tiptoe, heel walk and tandem gait." (R. 6, PageID.537.)

Similarly, the ALJ properly observed that other findings in Dr. Tarakji's records supported only mild or moderate limitations. (R. 6, PageID.46-47.) Specifically, the imaging studies the physician reviewed did not reveal any extreme impairments. The most recent study of her legs was, per Dr. Tarakji, "essentially a normal study." (R. 6, PageID.830.) It uncovered no evidence "of lumbosacral radiculopathy or plexopathy of both lower extremities," or "diffuse neuropathy or mononeuropathy." (*Id.*) Only L5 nerve root irritation showed as an issue on the images. (*Id.*) The only difference between these results and those from a 2013 study was the nerve irritation. (R. 6, PageID.524; *see also* R. 6, PageID.534 (an "essentially normal study" of the legs showing slight root irritation).) Studies conducted in 2016 to investigate Plaintiff's headaches produced normal results, as did ones from 2013. (R. 6, PageID.532-533, 678-679.)

Regarding her back, a note from 2016 referenced "degenerative changes with neural foraminal narrowing," but the degree of the changes and overall severity of the condition was not described. (R. 6, PageID.677.) An earlier MRI of her back displayed only "mild

28

degenerative changes with neural foraminal narrowing and bulging disk, causing no central stenosis," nerve irritation, and "no evidence of significant disk herniation, but protrusion at the level of C3-C4 with some neural foraminal narrowing." (R. 6, PageID.531.) After reviewing another 2013 MRI, Dr. Tarakji thought that Plaintiff had only "mild disk pathology." (R. 6, PageID.538.) In 2015, her right wrist was shown to have mild to moderate carpal tunnel syndrome, while her left wrist's was mild; there was no evidence of "radiculopathy, brachial plexopathy, diffuse neuropathy or other mononeuropathy of both upper extremities." (R. 6, PageID.674.)

In short, Dr. Tarakji's records do not suggest that pain, fatigue, or sleep deprivation would prevent Plaintiff from sustaining work, regardless of whether any specific diagnostic test could measure this ability. It is also true, as the ALJ noted, that the doctor's medical records fail to mention any extreme conditions or limitations. Plaintiff counters this conclusion by discussing other evidence (much of which she does not provide citations for), such as nerve root impingement, bone spurs, disc protrusions, and the like. (R. 12, PageID.884.) Except for one mention of moderate to marked facet hypertrophy, none of the evidence as described by Plaintiff speaks to the severity of impairments.

This oversight on Plaintiff's part largely sinks her argument. The ALJ's point was that the evidence (specifically, Dr. Tarakji's) did not demonstrate severe problems, so Plaintiff needed to counter with evidence about the magnitude of the conditions. The only evidence she offers regarding severity, the facet hypertrophy, is uncited (presumably it comes from a July 10, 2013 MRI at R. 6, PageID.505), and she does not explain what this showing means or how it affects her. Dr. Tarakji had this study before him when he wrote

29

that Plaintiff experienced "mild degenerative changes with neural foraminal narrowing and bulging disk," nerve root irritation, and no significant disk herniation but some protrusion. (R. 6, PageID.531.) So it does not appear that the study reveals severe issues. Plaintiff's account of the other evidence is unilluminating because it fails to suggest, at least to a lay reader, the degree of impairment.

The ALJ's final rationale was that Dr. Tarakji and others prescribed a conservative course of treatment. This "constitutes a 'good reason' for discounting a treating source opinion." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016). The most invasive mode of treatment Plaintiff received was epidural injections, which courts consider to be conservative. *See Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014); *Boyd v. Comm'r of Soc. Sec.*, No. 9-CV-10329, 2010 WL 1286461, at *7 (E.D. Mich. Feb. 25, 2010). Plaintiff's other treatments, such as pain medication, were also properly labeled "conservative." *See, e.g.*, *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 806 (6th Cir. 2011) (characterizing pain medications as conservative treatment). What is more, Dr. Tarakji called the treatment "conservative," as did other doctors, even before he stopped the injections. (R. 6, PageID.391, 399, 531, 677, 680, 682.)

An ALJ should consider any reasons a claimant might offer for pursuing only conservative treatment. *See Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015). Here, Plaintiff has not produced a convincing explanation. She speculates that her doctors actually wanted to operate on her back, they just did not know how best to do it "given the multi-level nature of her pathology." (R. 12, PageID.884.) This conjecture is not based on the record. Time and again the doctors ruled out surgery, never suggesting that she needed

30

one but her problems were too "multi-level" to conduct it. As one doctor stated, "I do not feel she needs or would benefit from any surgical procedures and would therefore suggest she continue with a repeat course of physiotherapy, back exercises, Pain Clinic interventions, [and] a TENS unit." (R. 6, PageID.488; *see also* R. 6, PageID.676 ("No recommended surgery."); 701 ("She is not a candidate for injections or surgery."); 709 ("She reports that she was seen by a neurologist, as well as neurosurgeon, and was advised that surgery is not appropriate."); 713 ("She has not been a candidate for surgery.").)[11] Another doctor thought the pain might warrant surgery, but rejected the idea after reviewing imaging studies, noting that the results did not explain the pain. (R. 6, PageID.423-424.)

No doctor recommended surgery and only two encouraged her to get an opinion from a surgeon. The first was Dr. Reddy, who in May 2012 advised Plaintiff to see a neurosurgeon. (R. 6, PageID.405.) When that surgeon "recommended no surgery," Dr. Reddy thought a second opinion should be obtained. (R. 6, PageID.407-408.) The matter was not discussed again in her notes. Later, in August 2014, Dr. Rebecca Baumbach wrote that Plaintiff "must pursue surgical intervention with [a] second opinion" from a surgeon. (R. 6, PageID.616.) But after the surgeon recommended against surgery, Dr. Baumbach appears to have dropped the matter. (R. 6, PageID.602-609.)

---

[11] Dr. Tarakji also ruled out surgery for carpal tunnel syndrome. (R. 6, PageID.527, 673, 681, 682.)

Thus, the record does not support the notion that Plaintiff's doctors wanted to operate. The only the treatment she received, then, was conservative, and the ALJ could rely on this fact as a "good reason" for discounting Dr. Tarakji's opinion.

The ALJ acknowledged that other regulatory factors favored Dr. Tarakji's opinion, such as his familiarity with Plaintiff's condition. (R. 6, PageID.46.) Nevertheless, the decision provides "good reasons" for discounting the opinion, including the lack of support and the conservative treatment. For these reasons, I suggest that the ALJ's treating-source analysis did not err. And because her SSR 96-8p argument hinged on showing that Dr. Tarakji's opinion should have resulted in a more restrictive RFC, that argument fails as well.

### 2.    SSR 96-9p

Plaintiff's other argument is that the ALJ bungled application of SSR 96-9p. (R. 6, PageID.877-882.) That Ruling addresses cases, like the present one, in which the RFC limits the claimant to less than a full range of sedentary work. SSR 96-9p, 1996 WL 374185, at *1 (July 2, 1996). Such a circumscribed RFC usually leaves few jobs within the claimant's capabilities. *Id.* As the Ruling states, the pool of available sedentary positions might be drained by certain additional restrictions, including a sit-stand option, the need for a hand-held assistive device, and manipulative limitations. *Id.* at *7-8.

If this were all the Ruling said, Plaintiff might have a point. Here, the RFC contains all these restrictions, raising the possibility that the occupational base—*i.e.*, the number of available jobs—had eroded and a significant number of positions were not available. (R. 12, PageID.881.) Plaintiff is confident enough about the paucity of available jobs that she

32

contends an award of benefits is required. (*Id.*)

But SSR 96-9p makes clear that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of 'disabled.'" SSR 96-9p, 1996 WL 374185, at *1. For this reason, the Ruling's solution to the problem, *i.e.*, erosion of the sedentary occupational base, is not to award benefits—although such an approach is not prohibited either, *see Yoder v. Comm'r of Soc. Sec.*, No. 10–14941, 2011 WL 6308313, at *6 (E.D. Mich. Dec. 16, 2011), *relief from judgment rejected by* 2012 WL 5379184, at *2 (E.D. Mich. Oct. 31, 2012)—but to direct the ALJ "to consult a vocational resource." SSR 96-9p, 1996 WL 374185, at *7-8; *see also Campbell v. Comm'r of Soc. Sec.*, No. 08–11651, 2009 WL 2777718, at *4 (E.D. Mich. Aug. 27, 2009) ("To determine whether there is other work in the national economy that Plaintiff can perform, Social Security Ruling 96–9p recommends the ALJ consult a vocational resource.").

That is what the ALJ did here. He addressed SSR 96-9p, explaining that the job base may have eroded and that the Ruling directed him to consult an expert. (R. 6, PageID.49-50.) The expert's testimony provided valid evidence that the occupational base had not eroded so much that Plaintiff was unable to perform a significant number of jobs. Accordingly, the ALJ did not violate SSR 96-9p. *Cf. Campbell*, 2009 WL 2777718, at *4 (rejecting the plaintiff's SSR 96-9p argument because, in part, the ALJ relied on a vocational expert); *Barringer v. Colvin*, No. 1:13CV1061, 2014 WL 809784, at *10-11 (N.D. Ohio Feb. 28, 2014) (same).

Plaintiff also thinks that the vocational expert's testimony regarding employer accommodations of wrist braces, canes, and a sit-stand option contravened *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999). That case, Plaintiff says, stands for the proposition that the ALJ "is not supposed to ponder whether an employer may or may not offer accommodations." (R. 6, PageID.881.) True enough, but this prohibition does not extend to the sort of accommodations the expert here was talking about.

*Cleveland* addressed the apparent tension between the Social Security Act and the Americans with Disabilities Act. 526 U.S. at 797-798. The former requires proof that claimants cannot work, while the latter provides relief for those who want reasonable accommodations so that they can work. *Id.* The issue was whether receiving Social Security benefits barred a plaintiff from pursuing relief under the ADA for a reasonable accommodation. *Id.* In deciding that it did not, the Court explained that decisions about disability benefits "do[] *not* take the possibility of 'reasonable accommodation' into account, nor need the applicant refer to the possibility of reasonable accommodation when she applies." *Id.* at 803. Still, an ADA plaintiff had to explain why, despite receiving benefits, she could prevail on the ADA claim. *Id.* at 8-6.

*Cleveland* focused on plaintiffs in ADA actions, not applications for disability benefits. Nevertheless, courts apply its analysis to Social Security cases and hold that vocational experts cannot base their estimate of available jobs on the possibility of reasonable accommodations under the ADA. *See Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999) ("[A] vocational expert should not base his determination of the availability of jobs on the assumption that the ADA requires an employer to accommodate an individual's

34

disability."); *Eback v. Chater*, 94 F.3d 410, 412 (8th Cir. 1996) (rejecting the argument that "a determination of relevant jobs existing in the national economy in significant numbers must be based on an assumption that the employer would be willing to make accommodations under the ADA"); *Eaglebarger v. Astrue*, No. 1:11-CV-00038, 2012 WL 602022, at *5 (N.D. Ind. Feb. 23, 2012) ("Indeed, '[i]t is error for a VE to cite jobs based on assumptions about employer accommodations, rather than on how the jobs are normally performed in the competitive job market.'" (citation omitted)).[12] Though it does not appear the Sixth Circuit has adopted this position, it has stated that "[a]n individual's application for and receipt of Social Security disability benefits . . . gives no consideration to that person's ability to work with reasonable accommodation." *Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 382 (6th Cir. 1998). Relying on this statement or other caselaw, courts in this Circuit have held that ALJs cannot utilize a vocational expert's testimony that is based on an ADA reasonable-accommodations analysis. *See Gadke v. Comm'r of Soc. Sec.*, No. 1:12 CV 2875, 2013 WL 5428727, at *20 (N.D. Ohio Sept. 26, 2013); *Widener v. Astrue*, No. 08–107–DLB, 2009 WL 2778215, at *4-5 (E.D. Ky. Aug. 27, 2009).

Not all talk of "accommodations" at the hearing will discredit the expert's

---

[12] These courts do not cite any statute, regulation, or rule that affirmatively prohibits experts or ALJs from considering reasonable accommodations. The bottom line requirement is that jobs exist in significant numbers that have requirements the applicant perform. 20 C.F.R. § 404.1566(a)-(b). The regulations do not suggest those requirements must be the normal job duties rather than duties adjusted by the reasonable accommodations the ADA legally mandates. The problem, however, with lugging ADA considerations into a disability case is obvious. The Commissioner (whose burden it is to prove job numbers) would first have to demonstrate that the ADA would apply to the employers and lead to the reasonable accommodations being imposed, either voluntarily or through litigation. The complexity of the analysis and the highly contingent number of resulting of jobs (*i.e.*, a significant number made available through ADA litigation or the threat of it) could make a hash of step five. For this reason, reasonable accommodations under the ADA should have no place in the calculation of available jobs in disability cases.

testimony, however. The Commissioner's assessment of available positions "'must be based on broad vocational patterns . . . rather than on any individual employer's practices.'" *Eaglebarger*, 2012 WL 602022, at *5 (quoting Memorandum from Daniel L. Skoler, Associate Commissioner for Hearings and Appeals to Administrative Appeals Judges, reprinted in 2 *Soc. Sec. Practice Guide*, App. § 15C(9), pp. 15–401 to 15–402 (2011)). An expert's "professional opinion as to the availability of typical accommodations in the workplace" reflects the sort of broad vocational patterns the decision must be based upon; these accommodations are not equivalent to the "more formal accommodations that must be requested under the ADA." *Ferguson v. Colvin*, No. 3:13–CV–00262–RCJ–VPC, 2014 WL 1382523, at *10 (D. Nev. April 3, 2014); *see also Jones*, 174 F.3d at 694 ("[T]he expert's reference to the ADA suggests not that he assumed that assembler jobs required accommodation, but that allowing for an employee to alter between sitting and standing is a prevalent accommodation in the workplace."); *Harris v. Colvin*, No. 3:12CV2302, 2013 WL 4517866, at *4 (N.D. Ohio, Aug. 21, 2013) ("[T]he [vocational expert's] response to the ALJ's hypotheticals reflected his professional opinion on common workplace accommodations—not formal accommodations that must be requested under the ADA."). In other words, experts can testify about accommodations that relate to larger vocational trends already prevalent in the market, not narrower ADA-imposed accommodations.

Also, the cases establish that the expert's testimony must be interpreted with a dose of common sense: simply saying the word "accommodation" does not mean the expert was invoking the ADA. *See Ferguson*, 2014 WL 1382523, at *11 ("While the VE used the term 'accommodation,' which perhaps arguably raised the specter of the ADA, the ALJ did not

conflate the Social Security inquiry with one under the ADA. The VE's testimony as a whole conveys that plaintiff's having to elevate her leg above her heart for fifteen minutes every ninety minutes would perhaps only slightly reduce the number of . . . positions available."); *Harris*, 2013 WL 4517866, at *4 ("The VE's use of the term accommodation does not invalidate his professional opinion or the ALJ's reliance thereon.").

Here, Plaintiff pounces on the expert's mere use of the term "accommodation." When the ALJ asked whether an individual could perform certain jobs with a wrist brace, the expert reduced the number of positions she had just asserted "because I don't think all of those jobs are going to accommodate wrist braces." (R. 6, PageID.96.) In response to the ALJ's addition of a sit-stand option, the expert simply responded that she would reduce the number, leaving tens of thousands available; a similar exchange occurred regarding the cane limitation. (R. 6, PageID.96-97.)

The expert gave no indication she meant an ADA reasonable accommodation. Rather, each round of additional limitations left thousands of jobs available, suggesting that employers commonly accommodated those limitations. *Cf. Ferguson*, 2014 WL 1382523, at *11. Indeed, courts have said as much about the sit-stand option. *See Jones*, 174 F.3d at 694 (noting that even though the expert mentioned the ADA, the testimony clearly conveyed that "allowing for an employee to alter between sitting and standing is a prevalent accommodation in the workplace" (citing *Pena v. Apfel*, No. C–97–4445–VRW, 1999 WL 155699, at *2 (N.D. Cal. Mar. 15, 1999) (noting testimony that sit-stand options are common accommodations)); *Cantrell v. Colvin*, No. 2:12–cv–01504–GMN–GWF, 2013 WL 5947808, at * (D. Nev. Nov. 5, 2013) (holding that the expert's testimony about

a sit-stand option was "not based on assumptions that isolated employers will accommodate Plaintiff's limitations" but instead on broader vocational patterns). Plaintiff offers no reason to believe that the wrist brace or cane limitations are any different. The expert never testified that the typical requirements of the available positions had to be modified so that Plaintiff could perform the jobs with the brace or cane. *Cf. Titus v. Astrue*, No. 1:11CV1286, 2012 WL 3113165, at *13 (N.D. Ohio, June 12, 2012) ("The [expert] never suggested that the hypothetical individual might require a "reasonable accommodation" in order to perform the work or that she assumed an employer would be willing to make such accommodations. Nor did she testify that the hypothetical individual's employability was contingent on whether an employer was willing to make an accommodation. Instead, the [expert] identified three jobs that the hypothetical individual could perform, taking into account the need to use a cane."), *Rep. & Rec. adopted by* 2012 WL 3113160 (N.D. Ohio, July 31, 2012).

Thus, the hearing progressed as it should: the ALJ restricted the hypothetical person limitation-by-limitation and the expert gauged how large a pile of jobs remained open to that person based on vocational considerations. The expert offered valid testimony and the ALJ did not err in accepting it.

## H.   Conclusion

For these reasons, I conclude that substantial evidence supports the Commissioner's denial of benefits and I recommend **DENYING** Plaintiff's Motion, (R. 12), **GRANTING** the Commissioner's Motion, (R. 14), and **AFFIRMING** the Commissioner's decision.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  April 12, 2019                    S/ PATRICIA T. MORRIS
                                         Patricia T. Morris
                                         United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 12, 2019                     By s/Kristen Castaneda
                                         Case Manager